```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
                                        :
GLOBAL NETWORK COMMUNICATIONS, INC.,    :
                                        :
                Plaintiff,              : 03 Civ. 7934 (LLS)
                                        :
            v.                          : Opinion and Order
                                        :
CITY OF NEW YORK, CITY OF NEW YORK      :
DEPARTMENT OF INFORMATION               :
TECHNOLOGY AND TELECOMMUNICATIONS,      :
                                        :
                Defendants.             :
                                        :
- - - - - - - - - - - - - - - - - - - -x
```

Plaintiff Global Network Communications, Inc. ("Global") filed its complaint in this action on October 7, 2003, alleging that the City of New York's regulations governing public pay telephones ("PPTs") and its actions (including removal of Global's PPTs from their locations on the streets, and threatened denial of Global's application for a franchise) violated federal law and Global's constitutional rights. On November 12, 2004, defendants the City of New York and its Department of Information Technology and Telecommunications ("DoITT") moved to dismiss the complaint (the original and amended complaints are collectively referred to as the "complaint").

On March 11, 2005, during the briefing of this motion, DoITT issued a final "Notice of Commissioner's Final Determination To Not Propose Award of a Public Pay Telephone Franchise to Global

Network Communications, Inc." (the "Final Determination"). Since the City's ordinances require that anyone who wishes to install and maintain PPTs on public rights-of-way must have a franchise to do so, see New York City Admin. Code §§ 23-402 and 23-403, the Final Determination ended Global's prospects of offering PPTs on City streets.

Applying Global's claims to the present facts, the complaint is dismissed for failure to state a claim upon which relief may be granted, for the following reasons.

1.

The federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 253(a) in sweeping terms forbids any state or local statute, regulation or legal requirement that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." However, a special provision preserves untouched the right of State and local governments to require fair compensation for use of local public streets. Section 253(c) expressly excludes, and provides a safe harbor for, "the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers ... for use of public rights-of-way ... ."[1]

---

[1] The omitted portions of this quotation require that the

The City's action in denying Global's application for a franchise fits comfortably within this safe-harbor exception. Inherently, the City's right to require compensation from telecommunications providers includes the reasonable expectation that its compensation will be paid accurately in full, on time, and without criminal involvement or fraud.

Global, as a telecommunications provider, through its president and sole owner Ronald Massie (an "associate" of the Bonanno crime family) has a flagrant criminal record of using its Mafia connections and defrauding its customers. Members of the Bonanno crime family, including a "capo," were given commissions for providing locations where Global could put its pay telephones. These were profitable locations, from which Global derived approximately 20-30% of its business income (Massie's testimony in U.S. v. Lombardozzi, pp. 540-43). Massie was allowed to use the name of Frank Lino, a "made" member of the Bonanno organization, to "intervene in any problems that we came across in the course of [Global's] business." (id. p. 537) During 1997 through March of 2000 Global defrauded those who were entitled to commissions for allowing telephones to be placed in their establishments, out of about $1,800,000 (id. p. 526):

> Q: Okay, Mr. Massie, you also told us that you pled guilty to mail fraud, correct?

---

compensation be competitively neutral and nondiscriminatory, and publicly disclosed.

> A: That's correct.
>
> Q: What did you do in connection with your plea of guilty to mail fraud?
>
> A: We mailed checks out to the people that receive commissions, based on the income of the company.
>
> Q: Okay. What was fraudulent about that?
>
> A: Instead of reporting all of the income, I skimmed money off the top, so it's not reported, thus, when we sent the commissions out, it wasn't based on the full amount of money collected.
>
> Q: Mr. Massie, approximately how much money did you skim when you were making these computations on the telephone commission?
>
> A: About a $1,800,000.
>
> Q: Over what period of time?
>
> A: From May of '97 through March of 2000.
>
> Q: Did you pay taxes on the money that you skimmed?
>
> A: I did not.
>
> Q: What did you do with some of the money that you skimmed?
>
> A: I diverted some of it offshore. I made loans with some of it. [2]

When the City commissioner declined to issue Global a franchise to place its PPTs on New York City property he stated, among other things:

---

[2] The loans were presumably in connection with his loan sharking business, in which he made loans at an interest rate of 2% per week (i.e., $700 per week on a $35,000 loan) and payment was enforced by threats (id. p. 525).

4

> As set forth in detail below, there are multiple independent bases for not proposing the award of a franchise to Global to the Franchise and Concession Review Committee: (1) Global established a significant part of its business through its use of organized crime soldiers; (2) Global has defrauded property owners who authorized use of property for Global PPTs; and (3) Global has been repeatedly delinquent in the payment of registry fees and thus cannot be reliably trusted to timely pay franchise compensation and also has significant unpaid fines related to its payphone operations that remain payable to the City.
>
> ...
>
> The City has legitimate right-of-way management concerns that include, for example, whether users of the right-of-way are able to complain about some aspect of a street PPT without fear of intercession by organized crime figures, whether City personnel whose task it is to enforce management of rights of way requirements can perform their jobs without fear of organized crime action, and whether reasonable compensation for use of the rights-of-way will be accurately paid to the City.

(Final Determination: Ex. U to March 11, 2005 Murray affid.)

No federal law or regulation should be construed to force the City to franchise Global to provide PPT services on New York City's public property and rights-of-way, when the record shows that Global cannot be expected to pay its obligations to the City in a timely or honest manner. Local governments as well as "Courts are free to assume that past misconduct is 'highly suggestive of the likelihood of future violations.'" United States v. Carson, 52 F.3d 1173, 1184 (2d Cir. 1995)(quoting SEC v. Management Dynamics, Inc., 515 F.3d 801, 807 (2d Cir. 1975)).

2.

A major thrust of plaintiff's argument is that the denial was wrong on the merits and lacked due process. One must consider separately claims that the refusal was erroneous, arbitrary or capricious and unfair (which must be determined in a New York Supreme Court Article 78 proceeding) from claims that the refusal systematically deprived Global of its due process rights (which raise constitutional issues and may be heard by this court without need for prior exhaustion of state remedies).

(a)

To the extent that Global alleges the City acted erroneously, arbitrarily or capriciously in its franchise denial and the removal of Global's PPTs, Global has not exhausted its state law remedies under N.Y. Civ Pract. Law & Rules Art. 78.

The Second Circuit has emphasized, citing Parrat v. Taylor, 451 U.S. 527 (1981), that "there *is no* constitutional violation (and no available § 1983 action) when there is an adequate state postdeprivation procedure to remedy a random, arbitrary deprivation of property or liberty." Hellenic American Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 882 (2d Cir. 1996) (emphasis in original). "In reviewing state

administrative proceedings, it is the function of the federal courts to determine only whether the state has provided adequate avenues of redress to review and remedy arbitrary action." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 888 (2d Cir. 1987). "Article 78 'provides the mechanism for challenging a specific decision of a state administrative agency.'" Campo v. New York City Employees' Ret. Sys., 843 F.2d 96, 101 (2d Cir. 1988) (citation omitted). "An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit." Hellenic, 101 F.3d at 881.

Therefore, Global's allegations that the City acted in an arbitrary and capricious manner in the franchise denial and the removal of the PPTs are dismissed for failure to exhaust state law remedies under N.Y. C.P.L.R. Art. 78.

(b)

Global has expressed substantial claims that the City's earlier actions against it were taken without proper notice to Global or opportunity for it to rebut, but (perhaps because of the way the case has evolved) has not directed any such claims (which would raise constitutional due process issues) against the Final Determination.

It would be difficult to do so. New York State Supreme Court Justice Louise Gruner Gans remanded, in an Article 78 proceeding, an earlier franchise denial by the City and directed that DoITT "must provide Global with the basic elements of procedural due process, notice and a timely opportunity to be heard on the issue of responsibility as a potential franchisee." <u>Global Network Communications, Inc. v. Dobrin</u>, Index No. 120402/00 (Sup. Ct. N.Y. County July 1, 2002)(Ex. L to Nov. 12, 2004 Murray affid., at 10).

Since then Global has had, and used, ample opportunities to present its case to DoITT. On February 28, 2003, the City issued a formal "Notice of Opportunity to Oppose Commissioner's Proposed Decision Not to Propose Award of a Public Pay Telephone Franchise to Global Network Communications, Inc." It set out the City's reasons for its proposed franchise denial, and invited Global to submit its arguments and evidence why the decision should not be rendered. Global replied at length in a letter dated March 28, 2003. On October 28, 2004, DoITT staff recommended that the Commissioner not propose Global for a PPT franchise. Again, it addressed the merits of the determination, and invited a response from Global. Global again responded, by letter dated January 12, 2005. At the end of this process, and fully aware of Global's views, DoITT issued its Final Determination on March 11, 2005. The Final Determination explicitly addressed each of Global's

objections, and DoITT's reasons for rejecting them.

The facts on which the City relied in reaching its decision are primarily contained in Mr. Massie's own testimony in United States v. Lombardozzi, and do not require an evidentiary hearing. "Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 333-35, 96 S. Ct. 893, 902-03 (1976); see also John Gil Constr., Inc. v. Riverso, 72 F. Supp. 2d 242, 254-55 (S.D.N.Y. 1999)("The Due Process Clause does not demand that the government provide a full evidentiary hearing each time it infringes upon a party's property or liberty interest").

Global has not pleaded any cognizable constitutional claim challenging the Final Determination.

(c)

Accordingly, whether based on a claim that the denial of the franchise was arbitrary and capricious, or on a claim that Global was denied due process, Global's attacks on the merits of the Final Determination are dismissed without prejudice to asserting whatever claims may be open to it under Article 78.

Global's papers point to certain provisions in the City's regulations and franchise requirements which might not survive examination under the case law applying the TCA. Court decisions have limited the scope of municipalities' rights of administration under the safe harbor provision, holding them narrowly to such matters as street construction, in order to avoid local interference with nation-wide free competition. Global also complains that some charges connected with the franchise are not fair and reasonable, or competitively neutral, or publicly disclosed.  Global argues that some of the City's inquiries into the business affairs of applicants exceed what is allowed by the courts as necessary to proper administration, and impede the TCA's policy favoring unfettered competition in the provision of interstate and intrastate telecommunications service.  See, e.g., TCG New York, Inc. v. City of White Plains, 305 F.3d 67 (2d Cir. 2002).

Those matters are immaterial here, for two reasons.  First, the City's refusal of a franchise to Global rests solidly on its authority to obtain compensation for the use of its rights-of-way, without need for further support under the City's general right of administration or consideration of its scope.  Second, since Global has no franchise it is unaffected by such

provisions, and has no standing to complain of them.

4.

Global argues that the City's actions were unauthorized because the Federal Communications Commission has passed a regulation providing that: "Each state must review and remove any of its regulations applicable to payphones and payphone service providers that impose market entry or exit requirements." 47 C.F.R. § 64.1330(a).

In its Report and Order, the FCC elaborated on the meaning of "market entry or exit requirements":

> The competition we observe today, however, has been significantly distorted by government regulation of prices, regulatory barriers to entry and exit, as well as by significant subsidies from other telecommunications services. Regulated prices prevent the market from operating efficiently to deploy payphone facilities. Moreover, some states currently prohibit the provision of payphone service by any entity other than the incumbent LEC. Removing these types of entry and exit restrictions is a necessary step toward allowing competitive forces to guide both the deployment of payphones and the setting of prices for payphone services.

11 F.C.C.R. 20541, 20548 at ¶ 13 (1996).

The City's denial of a franchise to Global has nothing to do with "government regulation of prices." Nor does it reflect the type of "regulatory barriers to entry and exit" contemplated by the FCC regulation. An isolated refusal to deal with an

applicant known for payment defaults and the defrauding of payees is not a "regulatory barrier to entry and exit." Nor did the City's denial of the individual franchise have anything to do with subsidies of other telecommunications services, or preference for an incumbent provider of PPT service.

Since the final determination to deny Global the franchise rested on Global's defaults on its obligations to the City and its untrustworthiness to pay compensation honestly, it is unaffected by the FCC regulation.

5.

Global claims that the City's actions:

> ... violate Global's rights to provide truthful commercial speech and non-commercial speech on its PPT installations, because Defendants refuse to allow Global to place advertising on its Curb-Line PPTs in the manner that the Defendants allow advertising on Curb-Line PPTs owned by those entities to which the Defendants have awarded PPT franchises. ...

First Am. Complaint at ¶ 254.

Since Global has not been awarded a PPT franchise, comparisons with those who have been awarded such franchises are meaningless. Global is not entitled to have PPT installations on the City's public rights-of-way, so the question of what advertising it could place on such installations (if it had them) does not arise.

Global also claims that the City has "retaliated against Global for its prior litigation against the Defendants and commencement of this litigation." Id. at ¶ 257.

Since the City's post-lawsuit actions are entirely consistent with the City's earlier franchise denial, which was issued before both the Article 78 proceeding and this litigation, Global has not met its burden to make more than conclusory allegations that the City acted with retaliatory intent. See Friedl v. City of New York, 210 F.3d 79, 85-86 (2d Cir. 2000) ("To survive a motion to dismiss, such claims must be 'supported by specific and detailed factual allegations,' not stated 'in wholly conclusory terms.'").

Accordingly, Global's claims of violation of its right to free speech, and of retaliation for its litigation, are both dismissed.

6.

Global claims that, by denying it a franchise to install and maintain PPTs on public rights-of-way, the City has "substantially impaired Plaintiff's rights under its contracts with third parties" in violation of the Contracts Clause, U.S. Const. Art 1, § 10. First Am. Complaint at ¶ 237. Global had entered into a contract to provide PPT services for Kinney

System, Inc., a public parking garage operator, and "installed numerous pay telephones pursuant to the Kinney Contract on City sidewalks adjacent to parking garages operated by Kinney System, Inc." Id. at ¶ 242.

The City's franchise denial does not discharge Global's obligations under its contract with Kinney, nor Kinney's obligations to Global. If Global is unable to perform, Kinney's remedies for breach are unimpaired. It was Global's duty to be able to perform its obligations, and it took the risk that it might fail to obtain the franchise (or license) that it needed in order to perform its obligations.[3] Nothing in the contract between Global and Kinney, or any other private party, could impose any duty upon the City to grant Global's franchise application. As stated by Mr. Justice Holmes, "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them." Hudson Water Co. v. McCarter, 209 U.S. 349, 357, 28 S. Ct. 529, 531 (1908); see also Manigault v. Springs, 199 U.S. 473, 480, 26 S. Ct. 127, 130 (1905)("... parties by entering into contracts may not estop the legislature from enacting laws intended for the public good."); Knoxville Water Co. v. City of

---

[3] In this case, it makes no difference that the law requiring a franchise came into effect after the Kinney contract. When the Kinney contract was made, Local Law 78 of 1959 required a license for the installation of PPTs, and Global did not have one.

14

Knoxville, 189 U.S. 434, 438, 23 S. Ct. 531, 532 (1903)("Some argument was attempted as to the ordinance impairing the obligation of the contracts between the company and its consumers. But such contracts, of course, were made by it subject to whatever power the city possessed to modify rates. The company could not take away that power by making such contracts.")

Global proceeded at its own peril in light of the risk that it might not obtain a franchise. Global's claim that its contract was unconstitutionally impaired is dismissed.

7.

Since Global makes no claim that the New York Public Service Law limits the City's authority to require compensation for the use of its public rights-of-way, its claims under that law are dismissed.

8.

Global's claims under 42 U.S.C. § 1983 are dismissed because all the underlying claims have been dismissed.

## Conclusion

The Clerk will enter judgment dismissing this action, with costs and disbursements to defendants according to law, without prejudice to plaintiff's assertion of claims that may be open to it in a proceeding in the Supreme Court of the State of New York under Article 78 of the New York Civil Practice Law and Rules.

So ordered.

Dated:   June 9, 2005
         New York, New York

                                                  */s/ Louis L. Stanton*
                                                  LOUIS L. STANTON
                                                      U.S.D.J.