UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
                                          |
Global Network Communications, Inc.,      |
                                          |
            Plaintiff,                     |        03 Civ. 7934 (LLS)
                                          |
      - against -                         |
                                          |        **Opinion and Order**
City of New York; City of New York        |
Department of Information Technology       |
and Telecommunications,                   |
                                          |
            Defendants.                    |
                                          |
------------------------------------------x

        Defendants   move   for   summary   judgment   dismissing   the
complaint.

        Plaintiff   Global   Network   Communications,   Inc.   ("Global")
claims   that   the   defendant   City   of   New   York's   ("City")
regulations   governing   public   pay   telephones   ("PPTs"),   its   denial
of   Global's   application   for   a   franchise   to   operate   PPTs   on   City
sidewalks   and   its   removal   of   some   of   Global's   PPTs   violated
federal   law   and   Global's   constitutional   rights.

        On   June   9,   2005,   this   Court   dismissed   Global's   claims,
holding   that   when   it   denied   Global's   application,   the   City
properly   relied   on   the   testimony   of   Global's   sole   owner   and
chief   executive,   Ronald   Massie,   an   associate   of   the   Bonanno
organized   crime   family,   who   had   a   flagrant   history   of   criminal
activity,   including   defrauding   the   owners   of   business   that   let

Global place its PPTs on their property.  373 F. Supp. 2d 378 (S.D.N.Y. 2005).  The Court of Appeals vacated and remanded, holding that Massie's testimony and the City's final denial of Global's application were not properly considered on a motion to dismiss.  458 F.3d 150, 158 (2d Cir. 2006).

On remand, the City's motion was converted into one for summary judgment so that both parties could present all materials pertinent to such a motion under Fed. R. Civ. P. 56.

BACKGROUND

The PPT Regulations

Local Law 78, adopted by the City in 1959, made it illegal to operate PPTs on City streets without a license. Nevertheless, by the early 1990s several companies had installed PPTs on City streets without licenses.  Local Law 68 of 1995 legalized previously installed, unlicensed PPTs on City streets, provided that their owner place such PPTs on an interim registry list, pay $75 per telephone per year in interim registry fees, and obtain a franchise from the City Department of Information Technology and Telecommunications ("DoITT") qualifying the company to obtain permits to operate PPTs on City

streets in exchange for fees.  Local Law 68, §6.[1]  A company whose franchise application is denied must either remove its PPTs from City streets or sell its PPTs to a company that has a franchise within a specified time.  Id.

Rejection of Global's PPT Franchise Application

Global was one of the companies that operated unlicensed PPTs on City streets before the PPT Regulations were enacted. In 1996 Global submitted approximately 1,000 of its PPTs located on or near City sidewalks to the City's interim registry, and in June 1997 submitted its application for a franchise.

As part of DoITT's evaluation of Global's application, an August 21, 1998 internal DoITT memorandum reported that a criminal investigation into Global's operations was pending, and noted that Global had a history of complaints for vandalism, threats of physical violence and intimidation, and installation of unauthorized telephones.  (Murray March 28, 2007 Aff. ("Murray Aff."), Ex. J.)  On May 30, 2000, after further investigation, the Commissioner of DoITT ("Commissioner") denied Global's franchise application, stating that Massie, along with Global's vice-president and bookkeeper, Alan Roth, had been

---

[1]  Local Law 68, the City's authorizing resolutions, DoITT's Requests for Franchise Proposals, and the City's Model Franchise Agreement are referred to collectively as the "PPT Regulations."

arrested by the FBI on March 1, 2000.  (Murray Aff., Ex. L at
2.)  The Feb. 29, 2000 criminal Complaint and Affidavit in
Support of Arrest Warrants identified Massie as an associate of
the Bonanno organized crime family and detailed his illegal
loan-sharking activities.  (United States v. Massie, No. 00-
0358M (E.D.N.Y.) (Murray Aff., Ex. K.)  The Commissioner also
cited a search warrant affidavit which alleged that Massie had
laundered money, including the proceeds of illegal loan-
sharking, through Global to organized crime members, and that he
had directed Roth to skim more than $4,000 per week in cash
receipts from Global's PPTs for Massie's personal use by falsely
reducing the receipts and altering computer records.  (Murray
Aff., Ex. L at 3-4.)

Global challenged DoITT's decision in a proceeding in the
Supreme Court of the State of New York pursuant to N.Y. C.P.L.R.
Art. 78.  That Court remanded Global's application to DoITT, to
give Global an opportunity to respond to the criminal
allegations and to explain what relationship, if any, they had
to Global's business operations.  Global Network Communications,
Inc. v. Dorbin, No. 120402/00, at 9 (LGG) (N.Y. Sup. Ct. July 1,
2002) (Murray Aff., Ex. M) (the "Article 78 Proceeding").  The
Court stated that if Global separated itself from Massie and
resubmitted its application, DoITT must reevaluate its decision
in light of Global's new ownership and management.  Id. at 11.

The Court also stated that "The allegations of criminality and ties to organized crime are most serious, and, if supported by proper proof, would establish a rational basis for finding lack of responsibility and denial of the franchise and permit." Id. at 9.

On November 7, 2001, while the Article 78 Proceeding was pending, Massie pled guilty to mail fraud, mortgage fraud and conspiracy to collect extortionate extensions of credit.[2] At his plea allocution, Massie admitted that he defrauded businesses who were entitled to commissions for allowing Global's PPTs to be placed on their property by paying them less than what they were owed under their agreements with Global. United States v. Massie, No. 00 Cr. 0440 (E.D.N.Y.) (Nov. 7, 2001 Tr. 24-25) (Murray Aff., Ex. O.)

On remand from the Article 78 proceeding, the Commissioner notified Global on February 28, 2003 that he was considering again denying its application, citing Massie's guilty plea, and gave Global ten days to submit any arguments or evidence challenging the proposed decision. (Murray Aff., Ex. Q.) Global responded by demanding a hearing and an opportunity to

---

[2] The state court was apparently not provided in the Article 78 Proceeding with a copy of the indictment or criminal information to which Massie pled guilty, and therefore could not evaluate whether the conviction implicated Global's business. Global Network Communications, Inc. v. Dorbin, No. 120402/00, at 9 (LGG) (N.Y. Sup. Ct. July 1, 2002) (Murray Aff., Ex. M.)

update its franchise application, and arguing that the City's franchise regulations were preempted by federal law. (March 28, 2003 letter to DoITT Commissioner, Murray Aff., Ex. R.) However, Global did not challenge Massie's plea allocution, and acknowledged that a criminal charge to which Massie had pleaded guilty related to Global's financial operations (id. at 4).

DoITT discovered more evidence of Global's involvement with organized crime. On April 23, 2003, Massie testified as a cooperating government witness against an alleged organized crime member. He testified that approximately 20 to 30 percent of Global's business derived from PPT locations that were enlisted or identified by members of the Bonanno organized crime family, that Global paid those family members monthly commissions, and that Massie was allowed to use the name of Frank Lino, a "made" member of the Bonanno organization, to "intervene in any problems that we came across in the course of [Global's] business." (United States v. George Lombardozzi, Apr. 23, 2005 Trial Tr. 537-543) (Murray Aff., Ex. S.) Massie also admitted that over a period of three years the amount he skimmed from the PPT commissions totaled approximately $1,800,000:

> Q: Okay, Mr. Massie, you also told us that you pled guilty to mail fraud, correct?
>
> A: That's correct.

Q: What did you do in connection with your plea of guilty to mail fraud?

A: We mailed checks out to the people that receive commissions, based on the income of [Global].

Q: Okay. What was fraudulent about that?

A: Instead of reporting all of the income, I skimmed money off the top, so it's not reported, thus, when we sent the commissions out, it wasn't based on the full amount of money collected.

Q: Mr. Massie, approximately how much money did you skim when you were making these computations on the telephone commission?

A: About a $1,800,000.

Q: Over what period of time?

A: From May of '97 through March of 2000.

Q: Did you pay taxes on the money that you skimmed?

A: I did not.

Q: What did you do with some of the money that you skimmed?

A: I diverted some of it offshore.   I made loans with some of it.[3]

(Id. at 526.)  He also admitted other crimes, including running

a multi-million dollar international cocaine smuggling ring:

---

[3] The loans were presumably in connection with his loan-sharking business, in which he made loans at an interest rate of 2% per week (i.e., $700 per week on a $35,000 loan) and payment was enforced by threats (id. at 525).

> Q: How is it that you became involved in cocaine trafficking with people from Brazil?
>
> A: There is a national holiday in February called the Carnival. I went down there for a party. At the party I met some, some influential people who ended up being in that business and I was able to enter into agreements with them to supply merchandise to me.
>
> Q: When you say merchandise, you are referring to cocaine?
>
> A: I am.
>
> Q: What quantities of cocaine were you trafficking at this point?
>
> A: When I entered into the agreement with them, we were, we were – I, I, I was selling ounces and sometime a half a kilo or more. After the involvement with them it became kilos only.

(Id. at 550.)

DoITT's staff recommended that Global's PPT franchise application be denied. (Recommendation attached to October 28, 2004 letter from DoITT Commissioner to Massie, Murray Aff., Ex. T.) It relied on several grounds, including:

> 1) Global benefited from organized crime intimidation; 2) Global has defrauded property owners who authorized use of their property for Global PPTs; 3) Global has been repeatedly delinquent in payment of registry fees and thus cannot be reliably trusted to pay franchise compensation[.]

(Id. at 5.) It further stated:

> Global cannot be reasonably trusted to timely and fully pay the City the reasonable

-8-

> compensation to which it would be entitled
> under a franchise contract or to otherwise
> abide by the terms of a franchise contract
> with the City.   Were the City to grant
> Global a franchise to use City street
> property for its PPTs, the City would be a
> location provider in the same position as
> location providers who Global intentionally
> defrauded according to Massie's own
> admissions under oath.   It would not be
> appropriate for the City to put itself in
> this position.

(Id. at 9.)

Global was given another opportunity to submit any arguments or evidence refuting DoITT's findings or disputing its recommendation.   (Id. at 12.)   Global's January 12, 2005 response neither disputed Massie's testimony, nor challenged the City's claim that Global was delinquent in payment of interim registry fees.   (Jan. 12, 2005 letter to DoITT Commissioner, Murray Aff., Ex. V.)   It did state that Global and Massie had "indicated a willingness to separate Massie from Global's day to day operations." (Id. at 3.)

DoITT nevertheless issued a final determination on March 11, 2005 ("Final Determination") denying Global's PPT franchise application, and stating:

> As set forth in detail below, there are
> multiple independent bases for not proposing
> the award of a franchise to Global to the
> Franchise and Concession Review Committee:
> (1) Global established a significant part of
> its business through its use of organized
> crime soldiers; (2) Global has defrauded
> property owners who authorized use of

property for Global's PPTs; and (3) Global has been repeatedly delinquent in the payment of registry fees and thus cannot be reliably trusted to timely pay franchise compensation and also has significant unpaid fines related to its payphone operations that remain payable to the City.

.    .    .    .

The City has legitimate right-of-way management concerns that include, for example, whether users of the right-of-way are able to complain about some aspect of a street PPT without fear of intercession by organized crime figures, whether City personnel whose task is to enforce management of rights of way requirements can perform their jobs without fear of organized crime action, and whether reasonable compensation for use of the rights-of-way will be accurately paid to the City.

(Final Determination, Murray Aff., Ex. U at 1, 3.)


Prior Proceedings in this Court


Global filed its complaint in this lawsuit on October 7, 2003, and an amended complaint on July 1, 2004.[4] It alleged that the PPT Regulations and denial of its franchise application were preempted by section 253(a) of the federal Telecommunications Act of 1996, 47 U.S.C. § 253(a), which provides that: "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the

---

[4] The original and amended complaints are referred to as the complaint.

ability of any entity to provide any interstate or intrastate telecommunications service."

Global also claimed that the City denied it due process under the Fourteenth Amendment, violated its First Amendment rights and unconstitutionally impaired its contractual obligations to a third party, and Global sought damages, attorney fees and injunctive relief under 42 U.S.C. §§ 1983, 1988.

The City moved to dismiss, arguing that even if TCA § 253(a) otherwise required it to grant Global a franchise to operate PPTs on City sidewalks, the rejection of Global's application was proper under section 253(c) of the TCA, which provides that:

> Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for the use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

47 U.S.C. 253(c).

This Court agreed, stating:

> The City's action in denying Global's application for a franchise fits comfortably within this safe-harbor exception. Inherently, the City's right to require compensation from telecommunications providers includes the reasonable

> expectation that its compensation will be
> paid accurately in full, on time, and
> without criminal involvement or fraud.

373 F. Supp. 2d 378, 379 (S.D.N.Y. June 9, 2005) ("June 9, 2005 Opinion"). Since Global was validly denied a franchise, it had no standing to challenge the City's PPT Regulations. Id. at 382.

Global's constitutional claims were also dismissed, but without prejudice to Global reasserting its claim that the City's determination was arbitrary and capricious in a New York state court.[5]

### Court of Appeals' Decision

The Court of Appeals for the Second Circuit vacated, and remanded with instructions to convert the City's motion to dismiss into one for summary judgment which could properly consider matters outside the pleadings, such as Massie's trial testimony and DoITT's Final Determination. 458 F.3d at 152. The Court of Appeals expressed "no opinion regarding the correctness of the trial court's rulings on the merits, and it

---

[5] Global subsequently asserted those claims in a second Article 78 proceeding. The state court held that the Commissioner was entitled to rely on Massie's criminal history as demonstrating that he lacked the character required to obtain a franchise, and that the Commissioner's denial of Global's application was a lawful exercise of his discretion under state law. Global Network Communications, Inc. v. Menchini, No. 109531/05, at 4 (PGF) (N.Y. Sup. Ct. Nov. 28, 2005) (Murray Aff., Ex. X) ("2005 Article 78 Decision").

may well be that upon a motion for summary judgment the court will reach the same conclusions as it did initially." Id. at 158.

The City's motion to dismiss was converted into one for summary judgment under Fed. R. Civ. P. 56 on October 20, 2006, and both parties presented their materials supporting and opposing the motion, a process which was completed in early July 2007.

SUMMARY JUDGMENT

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All reasonable inferences are to be made in favor of the non-moving party. See Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999). If the moving party meets its burden of showing that there is no genuine issue of material fact, then the non-moving party "must come forward with evidence that would be sufficient to support a jury verdict in his favor." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

DISCUSSION

Section 253 of the Telecommunications Act

The federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 253(a) in sweeping terms forbids any state or local statute, regulation or legal requirement that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." However, a special provision preserves untouched the right of State and local governments to require fair compensation for use of local public streets. Section 253(c) expressly excludes, and provides a safe harbor for, "the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers . . . for use of public rights-of-way . . . ."[6]

The City's action in denying Global's application for a franchise fits comfortably within this safe-harbor exception. Inherently, the City's right to require compensation from telecommunications providers includes the reasonable expectation

---

[6] The omitted portions of this quotation require that the compensation be competitively neutral and nondiscriminatory, and publicly disclosed.

-14-

that its compensation will be paid accurately in full, on time, and without criminal involvement or fraud.   No federal law or regulation should be construed to force the City to franchise Global to provide PPT services on New York City's public property and rights-of-way, when the record shows that Global cannot be expected to pay its obligations to the City in a timely or honest manner.   The undisputed evidence supports the City's determination that it need not trust Global to pay the City's compensation in such a manner.   Global does not challenge the evidence of its criminal history or non-payment of interim registry fees.   Instead, it argues that the City's franchise denial was not a valid exercise of its authority to manage use of the rights-of-way and to require compensation for such use. But if Global were franchised to operate PPTs on City streets, the City's position would be similar to the property owners Massie admitted defrauding.   The Second Circuit has recognized that under TCA § 253(c) a regulation "might permit rejection of a transferee on the basis of insufficient assurance of ability to pay reasonably imposed fees for use of rights-of-way."   TCG New York, Inc. v. City of White Plains, 305 F.3d 67, 82 (2d Cir. 2002) (dictum).

Nor does Global's speculation that it has overpaid the City (the subject of a current dispute) diminish the legitimacy of the City's concerns.   Local governments as well as "Courts are

free to assume that past misconduct is 'highly suggestive of the likelihood of future violations.'"   <u>United States v. Carson</u>, 52 F.3d 1173, 1184 (2d Cir. 1995), quoting <u>SEC v. Management Dynamics, Inc.</u>, 515 F.2d 801, 807 (2d Cir. 1975).

Global argues that the City's denial of its application was discriminatory and therefore not protected by TCA § 253(c) because the City has granted telecommunication franchises to other companies that also have engaged in unscrupulous business practices.   Global points to occasions on which Verizon, Qwest, MCI/Worldcom and Consolidated Edison have been fined for violations of consumer protection laws and environmental crimes, settled charges of securities fraud, and have been accused of defrauding other companies.   It asserts that Verizon has installed PPTs without licenses and been involved in a dispute with the City about commissions properly owed to the City on its PPT revenues.   Whatever the merits of those matters, none of them is claimed to involve obtaining 20-30% of the business through organized crime family members, using them to resolve disputes, paying them commissions, loan-sharking or cocaine smuggling.   Nor is there a parallel in the employment of Alan Roth (a former Global employee who pled guilty to the same indictment as Massie) in the daily operations of a telecommunications company that holds a PPT franchise and "is one of the five largest PPT operator[s] in the City."   (Pl.'s

May 25, 2007 Opp. Br., p. 17).   Mr. Massie is the sole
shareholder and chief executive of Global, whose very business
is partly the product of organized crime members and whose
customers were defrauded by Global of $1.8 million.

Finally, Global argues, as it did in opposition to the
City's motion to dismiss, that numerous provisions of the City's
PPT Regulations, on their face, are not limited to its
management of public rights-of-way or requirement of
compensation under TCA § 253(c).   For example, Global complains
that the City has assumed unfettered discretion to deny
franchises, impermissibly regulate telecommunication services,
rates and equipment, require approval of advertising vendors and
demand a percentage of advertising commissions, and it asserts
that many of the regulations are neither competitively neutral
nor non-discriminatory, because they favor Verizon over other
PPT operators.   As stated in the June 9, 2005 Opinion, 373. F.
Supp. 2d at 382, such provisions "might not survive examination
under the case law" but those matters are immaterial here, for
two reasons.   <u>First</u>, the City's refusal of a franchise to Global
rests solidly on its authority to obtain compensation for the
use of its rights-of-way, without need for further support under
the City's general right of administration or consideration of
its scope.   <u>Second</u>, since Global has no franchise it is

unaffected by such provisions, and has no standing to complain of them.

In short, there is no factual issue presented altering the conclusion that the City's rejection of Global's application lay within the "safe harbor" provision of § 253(c), and the claim of violation of TCA § 253 is dismissed.


Market Entry or Exit Regulation


Global argues that the City's actions were unauthorized because the Federal Communications Commission has passed a regulation providing that: "Each state must review and remove any of its regulations applicable to payphones and payphone service providers that impose market entry or exit requirements." 47 C.F.R. § 64.1330(a).

In its Report and Order, the FCC elaborated on the meaning of "market entry or exit requirements":

> The competition we observe today, however, has been significantly distorted by government regulation of prices, regulatory barriers to entry and exit, as well as by significant subsidies from other telecommunications services. Regulated prices prevent the market from operating efficiently to deploy payphone facilities. Moreover, some states currently prohibit the provision of payphone service by any entity other than the incumbent LEC. Removing these types of entry and exit restrictions is a necessary step toward allowing

-18-

competitive forces to guide both the deployment of payphones and the setting of prices for payphone services.

Matter of Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, 1996 WL 547458, 11 F.C.C.R. 20541, 20548 at ¶ 13 (1996).

The City's denial of a franchise to Global has nothing to do with "government regulation of prices." Nor does it reflect the type of "regulatory barriers to entry and exit" contemplated by the FCC regulation. An isolated refusal to deal with an applicant known for payment defaults and the defrauding of payees is not a "regulatory barrier to entry and exit." Nor did the City's denial of the individual franchise have anything to do with subsidies of other telecommunications services, or preference for an incumbent provider of PPT service.

Since the final determination to deny Global the franchise rested on Global's defaults on its obligations to the City and its untrustworthiness to pay compensation honestly, it is unaffected by the FCC regulation.

Due Process

In 2005 this Court dismissed, for failure to exhaust state law remedies, Global's claim that the City acted arbitrarily and capriciously in denying the franchise and removing the PPTs.

June 9, 2005 Opinion, 373 F. Supp. 2d at 381.   Global thereafter

pursued its state remedies, bringing the 2005 Article 78

proceeding in New York Supreme Court.   That Court held:

> Commissioner Menchini lawfully
> exercised his discretion in denying Global's
> application for an award of a public pay
> telephone franchise on the ground that
> Global's principal, Massie, lacked the
> requisite good character, honesty and
> integrity.   In reaching his determination,
> Commissioner Menchini was entitled to rely
> on Massie's past criminal history as
> demonstrating a lack of the character
> required for [sic] franchisee.   . . .
> Accordingly, Commissioner Menchini's
> determination was rational, and not
> arbitrary and capricious within the meaning
> of the law.

(2005 Article 78 Decision, Murray Aff., Ex. X at 4.)   The N.Y.

Supreme Court also rejected Global's claim that the City was

required to entertain its proposal to separate Massie from

Global's day to day operations.   (Id. at 5) ("the respondents

are not required to accept Massie's offer to divest himself of

any interest in Global except a passive economic interest.").

Because the Article 78 proceeding provides an adequate remedy

for an arbitrary or capricious deprivation of property, Hellenic

Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877,

881-82 (2d Cir. 1996), Global's substantive due process claim is

dismissed.

Global's claim that it was denied sufficient notice and

opportunity to object to the City's franchise denial is

dismissed because Global has had, and used, ample opportunities to present its case to DoITT.   On February 28, 2003, the City issued a formal "Notice of Opportunity to Oppose Commissioner's Proposed Decision Not to Propose Award of a Public Pay Telephone Franchise to Global Network Communications, Inc."   It set out the City's reasons for its proposed franchise denial, and invited Global to submit its arguments and evidence why the decision should not be rendered.   Global replied at length in a letter dated March 28, 2003.   On October 28, 2004, DoITT staff recommended that the Commissioner not propose Global for a PPT franchise.   Again, it addressed the merits of the determination, and invited a response from Global.   Global again responded, by letter dated January 12, 2005.   At the end of this process, and fully aware of Global's views, DoITT issued its Final Determination on March 11, 2005.   The Final Determination explicitly addressed each of Global's objections, and DoITT's reasons for rejecting them.

The facts on which the City relied in reaching its decision are primarily contained in Mr. Massie's own testimony in United States v. Lombardozzi, and do not require an evidentiary hearing.   "Due process is flexible and calls for such procedural protections as the particular situation demands."   Mathews v. Eldridge, 424 U.S. 319, 333-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976); see also John Gil Constr., Inc. v. Riverso, 72 F.

Supp. 2d 242, 254-55 (S.D.N.Y. 1999) ("The Due Process Clause does not demand that the government provide a full evidentiary hearing each time it infringes upon a party's property or liberty interest"), citing Tully Const. Co., Inc. v. Hevesi, 214 A.D.2d 465, 466, 625 N.Y.S.2d 531, 532 (N.Y. App. Div. 1st Dept. 1995) ("in reaching a determination of nonresponsibility," of an applicant for a City contract, "written submissions, rather than an evidentiary hearing, are sufficient to satisfy the necessary requirements of due process" where the evidence included an FBI agent's sworn declaration of petitioner's connection to organized crime). Thus, Global's procedural due process claim is dismissed.


                            First Amendment


        Global claims that the City's actions:

            . . . violate Global's rights to provide
            truthful commercial speech and non-
            commercial speech on its PPT installations,
            because Defendants refuse to allow Global to
            place advertising on its Curb-Line PPTs in
            the manner that the Defendants allow
            advertising on Curb-Line PPTs owned by those
            entities to which the Defendants have
            awarded PPT franchises . . .

(Am. Compl. ¶ 254.)

        Since Global has not been awarded a PPT franchise, comparisons with those who have been awarded such franchises are

meaningless.   Global is not entitled to have PPT installations on the City's public rights-of-way, so the question of what advertising it could place on such installations (if it had them) does not arise.

Global claims that the rejection of its franchise application by the City was retaliation against it for bringing the 2002 Article 78 Proceeding and this action.  Global has made no showing that the City's denial of its application was in response to the filing of the 2002 Article 78 Proceeding or this action.   DoITT first recommended that Global's PPT franchise application be denied in its August 21, 1998 internal memorandum, and again in its May 30, 2000 decision; both occurred before Global commenced either the 2002 Article 78 Proceeding or this 2003 action.   Thus, the City's post-lawsuit actions are entirely consistent with the City's earlier franchise denial.   There is no basis for speculation that the City acted with retaliatory intent.   See Friedl v. City of New York, 210 F.3d 79, 85-86 (2d Cir. 2000) ("To survive a motion to dismiss, such claims must be 'supported by specific and detailed factual allegations,' not state 'in wholly conclusory terms.'").

Nor can the City's refusal to reconsider its decision in light of Global's offer to separate itself from Massie be viewed as a form of retaliation.   Global did not offer to sever its economic connection from Massie completely (but only from its

-23-

operations) and the City was entitled to consider his total ownership, as well as Global's other connections to organized crime and the fact that it had defaulted on its payment obligations. Cf. (2005 Article 78 Decision, Murray Aff., Ex. X at 4) ("the respondents are not required to accept Massie's offer to divest himself of any interest in Global except a passive economic interest.").

Accordingly, Global's claims of violation of its right to free speech, and of retaliation for its litigation, are both dismissed.


Contract Clause


Global claims that, by denying it a franchise to install and maintain PPTs on public rights-of-way, the City has "substantially impaired Plaintiff's rights under its contracts with third parties" in violation of the Contracts Clause, U.S. Const. Art 1, § 10. (Am. Compl. ¶ 237.) Global had entered into a contract to provide PPT services for Kinney System, Inc., a public parking garage operator, and "installed numerous pay telephones pursuant to the Kinney Contract on City sidewalks adjacent to parking garages operated by Kinney System, Inc." Id. at ¶ 242.

The City's franchise denial does not discharge Global's

obligations under its contract with Kinney, nor Kinney's obligations to Global.  If Global is unable to perform, Kinney's remedies for breach are unimpaired.  It was Global's duty to be able to perform its obligations, and it took the risk that it might fail to obtain the franchise (or license) that it needed in order to perform its obligations.[7]  Nothing in the contract between Global and Kinney, or any other private party, could impose any duty upon the City to grant Global's franchise application.  As stated by Mr. Justice Holmes, "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them."  Hudson County Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908); see also Manigault v. Springs, 199 U.S. 473, 480, 26 S.Ct. 127, 130, 50 L.Ed. 274 (1905) (". . . parties by entering into contracts may not estop the legislature from enacting laws intended for the public good."); Knoxville Water Co. v. City of Knoxville, 189 U.S. 434, 438, 23 S.Ct. 531, 532, 47 L.Ed. 887 (1903) ("Some argument was attempted as to the ordinance impairing the obligation of the contracts between the company and its consumers.  But such contracts, of course, were made by it

---

[7] In this case, it makes no difference that the law requiring a franchise came into effect after the Kinney contract.  When the Kinney contract was made, Local Law 78 of 1959 required a license for the installation of PPTs, and Global did not have one.

subject to whatever power the city possessed to modify rates. The company could not take away that power by making such contracts.")

Global proceeded at its own peril in light of the risk that it might not obtain a franchise. Global's claim that its contract was unconstitutionally impaired is dismissed.


New York Public Service Law


Since Global makes no claim that the New York Public Service Law limits the City's authority to require compensation for the use of its public rights-of-way, its claims under that law are dismissed.


42 U.S.C. §§ 1983 and 1988


Global's claims under 42 U.S.C. § 1983 and 1988 are dismissed because all the underlying claims have been dismissed.


CONCLUSION


For the above reasons, the City's motion for summary judgment is granted. The Clerk will enter judgment dismissing

the    complaint    and    amended    complaint,    with    costs    and
disbursements to the defendant according to law.

So ordered.

Dated: New York, NY
       August 30, 2007

                                        _Louis L. Stanton_
                                         Louis L. Stanton
                                            U.S.D.J.